

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-08-494-CV

IN THE INTEREST OF A.D.,
A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

After a bench trial, the trial court found by clear and convincing evidence (1) that M.V.M. (Mother) had knowingly placed or knowingly allowed her daughter, A.D., to remain in conditions or surroundings that endanger the physical or emotional well-being of the child,[2] (2) that Mother had engaged in conduct or knowingly placed A.D. with persons who engaged in conduct that

---

[1] See Tex. R. App. P. 47.4.

[2] See Tex. Fam. Code Ann. § 161.001(1)(D) (Vernon 2008).

endangers the physical or emotional well-being of the child[3] and (3) that the termination of the parent-child relationship would be in A.D.'s best interest.[4] Based on the findings, the trial court terminated Mother's parental rights to A.D.  Mother timely appealed.  In three issues, Mother contends that the evidence is legally and factually insufficient to support the endangerment findings and factually insufficient to support the best interest finding.  Because we hold that the evidence is sufficient, we affirm the trial court's judgment.

In its findings of fact and conclusions of law, the trial court found, among other things, that

- Mother has two other children not in her primary care;

- Mother had admitted that her actions significantly endangered the physical or emotional well-being of A.D.;

- Mother had violated a safety plan "designed to protect the child and prevent removal by pulling the child's hair and being discharged from the battered-women's shelter in which she and the child were given refuge";

- the State of Kentucky child welfare agency investigated two referrals of abuse involving Mother and A.D.;

- Mother had been involved in numerous relationships with "physically abusive paramours";

- A.D. was born prematurely because of stress suffered by Mother as a result of her relationship with a boyfriend (A.D.'s father) ("Father");

---

[3] *...* *See id.* § 161.001(1)(E).

[4] *...* *See id.* § 161.001(2).

2

- A.D. was burned while in the care of Mother while they were still living in Kentucky when another child lit a broom and swept it over A.D.'s head;

- Mother did not seek medical attention for A.D. regarding her burn until they arrived in Texas and Mother was directed to do so by CPS;

- Mother has lived with A.D. in at least five different individuals' residences, a homeless shelter, a battered women's shelter, motels, and a car;

- Mother has failed to provide a safe and stable environment for A.D.;

- Mother did not complete her family service plan and has admitted that she did not complete the plan;

- Mother did not actively participate in counseling services offered by the State and was discharged due to non-attendance;

- Mother has suffered from manic depression, attention deficit hyperactivity disorder, borderline bipolar disorder, and anxiety and panic attacks;

- Mother did not access mental health treatment offered by the State;

- Mother has had a significant, untreated lice infestation during the pendency of this matter and chose to forgo obtaining a statement from a health care professional indicating that the infestation was successfully treated because doing so would have been embarrassing;

- at the time of trial, Mother lived with a woman in government-subsidized housing, but Mother's name was not on the lease, she did not have a right to reside there, and she could be asked to leave at any time;

- Mother is not able to provide for the basic needs of A.D.;

- Mother was not prepared to take A.D. into her primary care on the day of trial; and

3

- the State made diligent efforts to identify a relative or kinship placement for A.D., but no suitable persons were identified.

The evidence shows that Mother's relationship with Father was filled with violence. While Mother was seven months pregnant with A.D., Father trapped her in a car until she threatened him with a stun gun. Mother admitted at trial that she put A.D. in danger at that time. In a different incident, when Mother was eight months pregnant with A.D., Father pushed her against some stairs. About a week after A.D. was born, while they were living with Father's grandmother, he told Mother to leave and threatened to kill her if she took A.D. When A.D. was about two months old, Father slammed Mother up against a window, and at that point, Mother broke up with him, or, as she put it, "He finally let [them] free." When A.D. was about six months old, Mother allowed Father to see A.D., and after he had spent about twenty minutes with her, "he walked up to [A.D.] like if he had a gun in his hand and pointed it straight at her forehead."

The testimony at trial showed that Mother has three children, including A.D., but that none of them are currently in her care. Before Mother left Kentucky, she and A.D., six months old at the time, had been living with another woman and that woman's six-year-old son. Mother testified that she had gone to the bathroom, and while she was gone, the boy lit a broom on fire

4

and passed it over A.D.'s head, burning her. Mother did not take A.D. to the doctor at that time. Instead, she took a bus to Texas with A.D. and went to the Safe Haven shelter.

When they arrived at Safe Haven, CPS became involved, and only at that time did Mother seek medical attention for A.D.'s burn. The CPS worker testified that a hair-pulling incident resulted in a safety plan being utilized. Contradicting Mother's testimony that the State removed A.D. because the Presbyterian Night Shelter was not a safe environment for the baby, the CPS worker testified that A.D. was removed after Mother violated the safety plan by hitting A.D. on the hand because she dropped a sippy cup. Mother testified that she merely "tapped" A.D. on the hand. Mother told her counselor that A.D. knew how to "push her buttons" when A.D. was seven months old.

Mother testified that once when A.D. was six months old, Mother blacked out because she had a roommate who was "constantly hollering" at her. Mother also testified that she was manic depressive, had ADHD, was borderline bipolar, and had anxiety and panic attacks. Yet Mother delayed getting MHMR services until near the time of trial and testified that her initial appointment with MHMR would take place the day following trial.

Mother has not had a stable home since her pregnancy with A.D. During her pregnancy, she and Father sometimes slept in the car. After their breakup,

5

she lived with a roommate in Kentucky for a short period before coming to Texas when A.D. was about six months old. They then lived in the Safe Haven shelter. After Safe Haven, Mother moved across the street to the Presbyterian Night Shelter, and A.D. was removed. Mother lived there for about four months.

At some point after the removal, Mother became romantically involved with a man, and she moved in with him. Mother lived with him for between five and seven months. According to Mother, she broke up with him after she found out that he had been stealing from his boss and that he had a drug problem. They also had to leave their apartment. Mother had since that time been living with a woman in government-subsidized housing. Mother did not know whether the woman had a CPS history or a criminal history. Mother had been living there for about two weeks at the time of trial. Mother's name was not on the lease, and she could have been asked to leave at any time. The CPS worker assigned to the case testified that she did not believe that the housing would be a stable environment for A.D. because Mother's name was not on the lease.

Mother completed parenting classes and submitted to a psychological evaluation. She attended a few counseling sessions. At the time of trial, Mother was not working full time. When asked how many hours a week she

6

worked, she stated that she worked "once a day for about two or three hours" and usually earned about twenty dollars per individual job. She testified that she would get a full-time job if that would help her get A.D. back. She said that she only had a part-time job because she could support herself on that income while she did not have custody of A.D.; she acknowledged that she had been told that she would probably need a full-time job by the date of trial.

After A.D. was removed from Mother's care, A.D. had repeated problems with head lice. CPS suspended Mother's visits with A.D. after Mother was determined to be the source of the lice. Mother acknowledged that she could have had the visits restarted by going to the health department to have her hair checked but testified that she did not go to the health department because it would have been embarrassing. Mother last saw A.D. about a month before trial.

The CPS worker testified that she believed that Mother loved A.D. but did not have the skills to be a parent. She further testified that Mother would stop a visit with A.D. if A.D. appeared bored or sleepy. The CASA worker testified that Mother and A.D. had a bond but that Mother had not taken advantage of the services offered to her and that if a three-month extension were granted to her, she would not be able to meet the CASA worker's expectations by that

7

time.  Mother acknowledged that before CPS became involved, A.D.'s life was neither safe nor stable.

The CPS worker testified that A.D. was in the home of dual-licensed foster parents who wanted to adopt her.  The CPS worker admitted that A.D. was doing well when she came in to care and was developmentally on target but stated that the baby was not very active and did not appear to have bonded.  At the time of trial, A.D. appeared to be bonding well with the foster family, was flourishing, and had become very social.

In her first two issues, Mother contends that the evidence is legally and factually insufficient to support the endangerment findings under subsections (D) and (E).[5]  As we have explained in a similar case,

> Endangerment means to expose to loss or injury, to jeopardize.  The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child.  Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being.  Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.
>
> . . . .  Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or

---

[5] *See id.* § 161.001(1)(D), (E).

8

emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review.[6]

Applying the appropriate standard of review,[7] we hold that, based upon our review of the record, the evidence is legally sufficient to support the trial court's endangerment findings regarding Mother under subsections (D) and (E). Also applying the appropriate standard of review,[8] we hold that the evidence is factually sufficient to support those findings. We overrule Mother's first two issues.

---

[6] *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4–5 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (citations omitted).

[7] *See In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005).

[8] *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

In her third issue, Mother contends that the evidence is factually insufficient to support the best interest finding. Applying the appropriate standard of review,[9] and based upon our review of the record, we hold that the evidence is factually sufficient to support the best interest finding. We overrule Mother's third issue.

Having overruled Mother's three issues, we affirm the trial court's judgment.

PER CURIAM

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED: September 10, 2009

---

[9] *See* Tex. Fam. Code Ann. § 263.307(a), (b) (Vernon 2008); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573–74; *C.H.*, 89 S.W.3d at 28; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).